Good morning, and may it please the Court, Erin Murphy on behalf of the appellants, I'm going to endeavor to save about five minutes of rebuttal time. Alaska's $500 campaign contribution limits are among the very lowest in the nation. They're considerably lower than any limit the Supreme Court has ever upheld, and adjusted for inflation, which Alaska does not do, they're lower even than one of the limits that the Court struck down in Randall v. Sorrell. As the Supreme Court- Just for clarity, and then I'll butt out again, but I just want to make sure, and it sounds like you're correct, nothing in the remand order seems to disturb our finding on the aggregate limit on how much money a candidate may receive from out-of-state residents, which we found unconstitutional, and further, the remand order also did not mention our finding on Alaska's aggregate limit on how much a political party may contribute to a candidate is unconstitutional. So does that comport with your understanding that we're only dealing with the remand, the 500 limits on individual contributions to candidates and election groups that are not political parties? Is that your understanding? Yes, that's my understanding as well, which is consistent. Those are the issues that we presented to the Supreme Court, and the issues that I understand the Supreme Court to have, you know, I mean, they vacated the opinion, but the issues I understand the Court to have instructed this Court to reconsider are the constitutionality of the limits as applied to individuals contributing to candidates and individuals contributing to groups. Does Ms. Fox agree with that? I think that I take the state to have agreed to that in the briefing in this case, but if I'm wrong about that, I'm sure she'll correct me when she's up, but I think those are the two issues that are on the table at this point. Let me ask you a preliminary question about the remand. Generally, as presented in Randall, the issues are sort of fact-intensive, and the District Court did not reach it because it relied on our precedent, which indicated that Randall was not controlling, as did we. So what's your position on whether we ought to remand in the first instance for the District Court either to make new findings based on the existing record or on a new record? I don't think there's any reason to do a remand here, because what the import of the danger signs in Randall is, is that it means this court has to engage in, to use the Supreme Court's word, it must examine the record independently and carefully to determine whether the state has met its burden. So here, we have a full record, so it's not like we need to go back down for the court to take new evidence or get new facts in light of the test. There's a record here, there was a trial, there were witnesses and all of that, and ultimately this court is going to have to engage in an independent, careful examination of that record on its own. So I think given how long this case has been going on, it would make quite a bit of sense for the court to just go ahead and do that on this fully developed record. And once you do... I'm sorry? I understand your position, so you can proceed with your argument. Sure. And I do think, just to be clear, that that is the one thing that the Supreme Court's opinion makes clear, that there are enough danger signs here that the court is at the point of needing to conduct that examination. Well, but they jumped to five, okay, and they don't do one through four, correct? So what are we to assume on that? And I think each side probably has a different assumption on that. Sure. So I think there's kind of two pieces of the Randall analysis. The first is whether there's enough danger signs that you're in that universe of having to do the careful consideration. And then, as you noted, there's the second part where the court goes through kind of five considerations. I think the best understanding of what the Supreme Court was instructing in its per curiam is, at the end of the day, if Alaska is here telling this court that it should be able to have contribution limits that are unconstitutional in Vermont, then Alaska needs to identify something about Alaska that's meaningfully different from the situation in Vermont. I think when you look at the five considerations, some of them have to do with the degree of burden, like indexing for inflation and the impact on volunteers. But kind of the core ones, the first one and the last one, really are both getting at, is there something different about this state than other states? Vermont, in the first consideration in Randall, tried to argue, look, this isn't going to impact us that much because people don't raise that much money and campaigns are really cheap here in Vermont. And the Supreme Court, notwithstanding the fact that it was agreed there that Vermont had the 49th lowest of 50 states, costs of campaigning in the nation, the Supreme Court didn't consider that to be a sufficient special justification to let Vermont have lower limits than the federal government could have or that the Supreme Court had ever upheld in any other case. Could I interrupt you for just a second? If we are to determine, by our independent and careful examination, the issue of special justifications, on whom is the burden of proof to show that there are special justifications to justify the limits? The burden of proof falls squarely on the state. I think that's the clear, you know, I mean, you get that from Randall, but even more so from McCutcheon versus FEC, another case the court referenced in its per curiam, where the court reminded in the specific context of contribution limits, I mean, a court there was asked to basically overrule Buckley and decide that you should have strict scrutiny instead of intermediate scrutiny. The court didn't reach that question and the reason it didn't reach it in McCutcheon is because the court said, even intermediate scrutiny, it's the state's burden. It's a meaningful burden. The state has to show fit matters and the state has to show that the fit is sufficient. And the court made clear that part of that analysis is narrow tailoring, but you have to look at, you know, did the state jump to the most restrictive means possible when it could have done less restrictive things to advance its interests? So I do think that when the court said in this remand that we should follow his first amendment precedence on the issue of proof, since that was not dealt with in the per curiam decision in Thompson versus Hampton, we should go to the next precedent, which is McCutcheon. Absolutely. You know, I mean, it's notable that in the court's language remand into this court, it didn't say we're sending it back for you just to revisit this under Randall. It said, we're sending it back for you to revisit it under this court's precedence. And the court discussed multiple of its precedents in the per curiam, not just Randall. And one of the points it made early on is the point that McCutcheon and Citizens United, you know, not only they, they changed the way that courts are supposed to be thinking about what counts as quid pro quo corruption. The court specifically highlighted the language from this panel's vacated opinion that had noted that the ninth circuit has an evidentiary standard for the states that is radically below what McCutcheon and Citizens United say in putting the burden squarely on the state in this context. And so I think when you put those things together, what the court is saying is not just, you know, yes, you want to do the Randall analysis, but you need to do the Randall analysis under the principle that McCutcheon made clear, which is intermediate scrutiny still means presumptively unconstitutional. And the burden is on the state to demonstrate that the limits are constitutional. My next question, which is in the per curiam decision, they make reference to the ninth circuit's burden of proof as being a low quantum of evidence to show the, to carry the day. Now, I'm not clear whether, since we reaffirmed that, can we depart from that other than an in-bank panel? I think the per curiam, the better reading of the per curiam is that it does free this court up to do that because it's not just that the court noted that that was this court's standard. The court, the language the court used was, it said that this court acknowledged that McCutcheon and Citizens United created some doubt as to the continuing validity of that standard, but noted that the ninth circuit had recently reaffirmed it. So I look at that and I read the court going out of its way to point out that this court acknowledged that ninth circuit precedent was inconsistent with Supreme court precedent. And I think that that gives this court the freedom to really look at all of this on, you know, essentially a clean slate in the sense that the precedent you should be looking to at this point is the Supreme court's precedent, not Edelman's gloss on what it thought the Now that said, I don't. What is the Supreme court's precedent on the burden of proof that has the Supreme court ever commented that the ninth circuit is wrong as to its low burden of proof? I don't think there's a case where the Supreme court has squarely confronted the ninth circuits test beyond this case and what I just read you from the per curiam opinion. But I mean, I would encourage you to go look at that language in McCutcheon where the plurality opinion in McCutcheon is saying why it doesn't need to resolve the debate about whether it should be strict scrutiny or intermediate scrutiny, because what the court said quite clearly is we don't need to resolve this debate because fit matters either way and the state bears the burden either way. And that again is just kind of give a little other gloss on that. I think it's the same. But according to Randall, we are to analyze whether the limits will significantly restrict the amount of funding available for challengers to run competitive campaigns. So tell me how that is different from one of the Edelman factors our panel opinion analyzed, which was whether the limit allows the candidate to amass sufficient resources to wage an effective campaign. And if it's not different, why should we go the other way at this time? Sure. I think it is different. And that's why, you know, I'm not sure this debate about exactly what the quantum of evidence is matters because I think that Randall is asking a different question. Randall is focused on the delta between what you can raise in a world without the limits and what you can raise in a world with the limits. That is not what Edelman was focused on. Edelman was simply focused on do you have so little money that you can't run an effective campaign at all? That is not the way Randall came at it. The very first part of Justice Breyer's analysis of that first factor was looking at how much money candidates were able to raise in a world where they didn't have these strict Vermont limits as compared to what they'd be able to raise in the world with them. And notably, the expert that the court relied upon in Randall on that was Mr. Benson, who was the same expert we put on here on that precise question. And he did an analysis of how candidates would be able to raise, were able to raise significantly more funds even just under the $1,000 limit versus the $500 limit. And we had another expert, Mr. Bender, whose I think his testimony begins around page 300 of the record excerpts. And I'd encourage you to look at that and the exhibits accompanying it because he too focused on this. And in Alaska, you know, we had this unusual dynamic of being able to look at that counterfactual world because Alaska started at $1,000, went down to $500 in 1997, went back up to $1,000 in 2003, and went back down to $500 in 2007. And so what Mr. Bender did is looked at the races that occurred under the $1,000 limit versus the $500 limit and looked at what the contribution amounts were in those comparative time periods. And he found that in the three years when it went back up to $1,000, House candidates were getting 30% more contributions vis-a-vis the years when it was $1,500. And as soon as the limit dropped, it dropped again by 30%. He also found that in the gubernatorial races, it increased by about 60% during that three-year period when the limit went up and dropped by the 60% yet again as soon as the limit went back down. That's exactly the kind of analysis that Justice Breyer's plurality opinion did in Randall. It looked at what was the percentage difference between a world with the new limits and the world without those limits beforehand. And he found that it was a significant reduction between 15 and 50%, and we're above that here. Those aren't numbers that the state disputed in terms of the evidence we put on. The problem before was under Edelman, that evidence just didn't really matter because Edelman didn't look at the delta between the world with the limits and without the limits. It just asked this kind of abstract question of, do candidates still have what we think is enough money to run races? What does the per curiam say about Randall and what we thought the holding was? What did they say if they did say we were wrong? I think the per curiam isn't exactly... They seem to sort of assume that Justice Breyer's got the majority, but I don't know. I think the clearest statement that the Supreme Court thought this court is wrong comes in the footnote in the per curiam opinion, where the court says that while the Ninth Circuit didn't think it had to follow Randall, the 10 other circuits, to use the Supreme Court's word, correctly followed Randall. I don't think that was just stray language that the court said all the other circuits were correct in comparison to what this court was doing. I think the clear import of that is, and really the only reason the court would even bother rebanding the case, is that the court considered this court's Edelman test to be inconsistent with what Randall was doing. I think that the right way to think about that is that Justice Breyer's plurality opinion is the best guidance that this court has as to how it should come about that analysis. But that said, I don't think that means that the court needs to look at Randall and view it as some sort of hermetically sealed five-factor test, and that's the only thing you look at in the world, and to the extent that the limits aren't precisely the way they were in Vermont or whatever it may be, that's how to analyze it. I think what you draw from Randall is the principle that there's a point at which contribution limits are so low and so different in kind from what the Supreme Court has previously upheld that the state needs to come forward with something that's different from what the Supreme Court has previously considered in cases like Buckley and Shrink, Missouri and Randall itself. Something that says, yes, other states may not be able to have a $500 limit, but we, Alaska, can. And the problem here is that Alaska doesn't have that. It just has the same basic arguments that we saw in Buckley about risks of quid pro quo corruption, and it has generalized arguments about, you know, there's reasons to think that some people have more access and influence here because there's particular industries that have, carry a lot of weight in Alaska. Those just aren't, I don't think reading Randall that you can understand those to be what the court had in mind with special justifications, because many of them are the same justifications the court considered and rejected there. If I may, I'd like to... No, you're down to about four minutes. Sorry. I was just going to say, if I may, I'd like to reserve the remainder of my time for rebuttal. Thank you. All right. Ms. Fox. Thank you. May it please the court. My name is Laura Fox, and I represent the members of the Alaska Public Offices Commission. So the Supreme Court has remanded for this court to apply Randall, and Randall says, when there are danger signs that make contribution limits seem on the low side, the court needs to delve into the record to see if they're closely drawn. Can you tell, can you say, I asked the question of your colleague on the other side first. Am I correct that we're dealing with the 500 to 500 on those two only? Yes, that's correct. Is that your understanding? Yes. I agree with her understanding there of the universe of what the court is looking at. And as a preliminary matter, what is your position on remand to the district court? I think that if this court doesn't want to do, so the Supreme Court remanded for this court to do that delving into the record itself, because the court didn't do the Randall analysis the first time around. And if this court wants to remand to the district court to do that, it could, but I don't think that's necessary. I agree that we have a record here that this court can consider in looking at that. So you wouldn't really do anything different on the record than what is already in the record. I know there was a fairly long bench trial, so. Well, the parties presented evidence that went towards the Randall factors as well as the Edelman test. And so I think the record contains enough information for the court to be able to do that analysis since the parties had both tests in mind when they were creating that record. And so that's the job that the Supreme Court has handed to this court is apply Randall to this record. Well, actually, when they remand for an analysis of the record, we often remand to the district court for its analysis in the first instance. So I didn't take the per curiam as requiring us to do it. It's just the lower courts to do it. Right. I agree that the court could remand it to the district court if it wanted the district court to do that in the first instance. Okay. Thank you. And so up until this point, the plaintiffs wanted to avoid, didn't really want the court to do that job that Randall says to look at the record. They wanted to avoid the record entirely. Their supplemental briefing contains not even a single citation to the record, and it wasn't until the end of counsel's argument just now that they asserted that the record here and that anything in the record here actually supports them as far as the Randall test. And I do encourage the court to look at the testimony that they've cited. Bender, who is actually the state's expert, not the plaintiff's expert, did have statistics about what happened when Alaska's contribution limits went from $500 to $1,000 and then back again. And that testimony of Bender does not support the plaintiff's position. It shows this natural experiment in Alaska with raising limits and lowering. It actually didn't increase the success of challenger candidates. It didn't. In fact, the incumbent fundraising advantage was higher when the limits were higher, supported the state's position that higher limits actually benefit incumbents over challengers. I guess I start with that. The Ninth Circuit hasn't done really well when the Supreme Court sends things back and tells you to do it again to say, well, we did it right anyway. Or there have been panels that they'll say, consider it in light of this case. And then the panel goes on to say, well, that case doesn't apply. The Supreme Court doesn't really look. I guess I'm a little bit hesitant to your arguing to affirm when the Supreme Court said we did it wrong in the first place and now do it this way. Tell me why I'm not flying in the face of what they're telling me I did wrong the first time. Well, the Supreme Court said the court was wrong not to apply Randall. So the Ninth Circuit had said in precedent previous to this court's opinion that Randall was actually not controlling, that it didn't have an opinion of the court and that it shouldn't be followed. And this court followed that precedent in saying, well, we're not going to apply Randall. And the Supreme Court said, hey, look, all these other courts, all these other circuits, they're looking at Randall. They're taking it seriously. You need to take it seriously also. And that doesn't mean that Randall is some kind of death sentence for contribution limits. All 10 of those cases that the Supreme Court cited from other circuits approvingly cited as following Randall, none of those cases struck down contribution limits. So by saying you need to follow Randall, the Supreme Court's not saying you need to strike these limits down. It's saying you need to take Randall seriously. All these other courts took Randall seriously and you need to also. Well, OK, you concede, I think, four. You say that favors Thompson because there isn't there's clearly been no consideration for inflation here, right? I guess that factor does favor them. I don't think but I do think all of the Randall, those five Randall considerations are all different ways of getting at the same basic concern of whether these limits are actually hurting campaigns or hurting the democratic process because they're preventing campaigns from functioning normally. And so if you look at it. OK, but four isn't one of your strong ones. Right. And I'm going to say five. If the Supreme Court said, hey, you've got danger signs here, that's not a slam dunk for you either. So how do you it's there it doesn't seem to be exact direction on. Do you have to get three of the five to win or is can five outweigh everything else? Or what what's what's what's the law on that? Well, I don't think it's a numbers game. Like I said, I think it's these five considerations are all different ways of getting at the Supreme Court's basic concern in Randall, which was that Vermont's limits were preventing campaigns from operating normally. And a main part of that major part of that was the fact that the limits applied the same to political parties. And so that if you look at the Supreme Court has pages and pages of discussion of those five considerations. And a lot of that discussion is about the fact that the. May I ask you a question? Have you taken the time to figure out what five hundred dollars in today's dollars represent in 1996? Have you deflated the five hundred dollars to what it was? I think the plaintiffs may have done that in their briefing, but that's a record in this case. I did that this morning with my little fancy inflation calculator and it came out that five hundred dollar limit back in 1996 would equate to two hundred ninety nine dollars, which is below every one of the Randall limits. For governor, for said state senator and for anybody else, the lowest limit in Randall was three hundred dollars. And this limit would be below the lowest limit in Randall. How do you address that as not being determinative in this case? Well, that's one of the danger signs from Randall. So if you look at Randall, it's in two parts. The Supreme Court says, are there danger signs? Are there things that make these limits seem low? And if there are, then we need to delve into the record. Inflation was not in the three danger flags. It was in the five elements after the first step. So address that, please. Right. I suppose that I was talking about the comparison of Alaska's limits to other limits and including the limits in Randall. But yeah, so inflation adjustment is one of these ways that the court was getting at this concern about, you know, and certainly the operation of inflation over time can make limits get too low if the limits start to be such that they're harming candidates' campaigns and preventing candidates from conducting effective campaigns. But here, the record showed that the effects of inflation have at least partly been offset by advances in campaign, campaign technology and the use of social media and things like that. And that's in the district court's findings. And that's in the record here that the effects of inflation have not actually impacted campaigns in that way. If you take $500 the other way around and say, what was $500? But $500 in 1996, what would it be worth today? By inflation calculator, over $1,100, which would be higher than any limit which the Supreme Court has allowed, which is in Shrink, Missouri, they allowed $1,085. Both ways, if you deflate, it's below Vermont. If you inflate, it's above Shrink, Missouri. Doesn't that tell us that these limits without inflation violate the First Amendment? No, because I think Randall makes clear that these sorts of comparisons are things that we look at when we're deciding in the first instance, are these limits that we need to look into? Are these limits that we need to be concerned about? And if so, we're going to look at these other things. We're going to delve into the record to see if they're supported, if they look low in comparison to others. But certainly not the Supreme Court didn't say in Randall that inflation adjustment was a constitutional requirement. Otherwise, all of those other pages of discussion in Randall would have been unnecessary. And the court said repeatedly. It would still be a factual determination for the district court to make? Well, it's one of these factors that the Supreme Court in Randall said repeatedly that these were factors taken together. That inflation was one of many factors taken together that led the court to be concerned about Vermont's limits. And one of the major, major things that led to this concern about Vermont's limits was the fact that political parties had to abide by the same low contribution limits, which 85 percent, especially in competitive elections. And so Alaska's limits don't share that major concern from Randall. So Randall didn't say inflation adjustment is required. In fact, I mean, this entire remand would have been unnecessary if the Supreme Court thought that, well, Alaska's limits aren't adjusted for inflation and they look low compared to other limits. If that was enough, the court wouldn't have needed to remand to this court at all. So what Randall says is if there are these factors, if there are these things that make the limits look low in comparison to other limits, in comparison to other limits we've upheld, other states' limits, then we have to look at them closer. In Alaska, candidates have less voters to reach, but they are spread out in a large state with different media markets. Doesn't that mean challengers to incumbents need more funds to reach those voters? Well, that's based entirely on speculation that's not in the record. The plaintiffs cite materials that are outside of the record. The record contradicts that. The record shows that campaigning is not particularly expensive in Alaska. Alaska's media markets aren't particularly expensive. There's no evidence in the record to support that. Alaska's on the cheaper side as far as campaigning. And again, these advances in campaign technology and social media and things of that nature there's testimony in the record to explain how that has, at least for the moment, at least partly offset the results of inflation. And there's nothing in the record to support their speculation about those things. And Randall says the court is supposed to be looking into the record and basing its decision on the record. And that's what the court did in Randall. The court has pages and pages and pages in Randall of looking into that record, explaining what it was about the record in the Vermont case that concerns the court. The court wasn't just speculating. If that's the kind of thing, if that's how this works, again, there would have been no need for a remand. We wouldn't need to look at the record. If we just affirm based on what your argument is, we already know we're in the Supreme Court cites. Okay. And let's say then Thompson petitions again with the new makeup of the court. Where do you think that's going to put you? I mean, I can't speculate about exactly what the court, whether the court would be interested in reviewing this court's record based application of Randall to the facts of the case. If the Supreme Court had been interested in revisiting this entire area. The Supreme Court has some interest in reviewing some of its own precedent in this area. And then we've got how many new members at this point? You've got what Gorsuch, Kavanaugh, and Coney, right? That would be different. Yeah. The Supreme Court had been interested in revisiting this entire area of law and changing its precedents in this area of law. It could have taken this case on the merits as opposed to issuing this kind of summary decision, just telling this court to apply Randall. So what the court did was it said, no, Randall is the law, the Ninth Circuit. You need to follow Randall like the other circuits. They didn't have Coney then either, did they? I don't believe so. No. Okay. They have to count to five too, just like we have to count to five. I'm just curious. Let's get to factor five, if you don't mind, which is the special considerations. Now, how would you? There are special justifications for having relatively low limits in Alaska. Different jurisdictions are different, so we can't just be looking at all the limits and saying these are the lowest. We're always just going to strike down the lowest, whatever they are. Different jurisdictions are going to have different limits, and some states are going to have lower ones. What's too low somewhere else is not necessarily too low in Alaska. These limits work on the ground in Alaska, given the costs and realities of campaigning in Alaska. The district court found that. The evidence supports that. There was really very little, if any, evidence to show otherwise. Justice Ginsburg, who is no longer on the court, obviously, was the only one that talks in the remand order. She was the only justice who stated that Alaska may have a special justification for its low individual contribution limits. No one else on the court said that, so it seems like the court might be suggesting that Alaska's special justification is not sufficient. Well, the court could have said that. The court remanded for this court to look at the record. Well, she's the only one that said she thought it was sufficient. It was radio silence from the other eight, right? Right. They were sending the issue back to this court. I guess Justice Ginsburg wanted to highlight that issue, and the rest of the court didn't particularly want to highlight that issue. Or didn't agree. That's all that they said about it. They remanded for this court to consider it. The district court found that Alaska is particularly vulnerable to corruption. It has the smallest bicameral legislature, which is something that ups the incentive for corruption. If somebody wants to engage in, quote, quote, quote, corruption to try to change legislation that they don't like or defeat legislation that they don't like, they only have to buy a handful of votes. That's a unique fact about Alaska that the plaintiffs completely ignore. It's not something that was true of Vermont. And Alaska is also extremely dependent on a single industry, and that's not just something about the state's economy. Although oil and gas makes up a large percentage of the state's economy, Alaska's state government gets 90% of its revenue from the oil and gas industry. There's no income tax, personal income tax, no sales tax, just basically oil and gas revenue. And no evidence was presented that there's any other state remotely like that in terms of its industry dependence. So this isn't anything like Randall, like the anecdote from the Randall trial about the slate industry trying to influence some particular decision in Vermont. Vermont absolutely does not get 90% of its revenue from the slate industry or any other industry. And so it's simply not true that Vermont made these same arguments in Randall and that the Supreme Court rejected them. And again, the main thing that was concerning, this concern that runs through all of the court's discussion, all those pages in Randall about Vermont's limits, is the fact that they made political parties subject to the exact same contribution limits, which reduced the amount that the candidates could get from political parties by 90%, 80%, very drastically reduced fundraising potential and made it impossible for parties to target their contributions at competitive races like parties normally do. And Alaska does not share that aspect of contribution limits from Randall. And the plaintiff's expert, Mr. Benson, his testimony was fatally flawed in ways that the district court and this court in the first instance recognized. His estimates were based on assumptions that came from nowhere. And even his inflated estimates of lost campaign revenue as a result of Alaska's contribution limits were nothing, even approaching what Vermont's were in Randall. And so that's what the, I mean, it's not just about special considerations, it's about what else was different between this case and Randall. What was it that really made the Supreme Court concerned about Vermont's limits in Randall? And that was the extent to which they just drastically, drastically reduced candidate fundraising, particularly in competitive races. And that concern is simply not present here. And so we have both special justifications, things about Alaska that make it unique, that make it make sense that Alaska is going to be one of the states with limits on the lower side. And we also are missing this thing that really concerned the Supreme Court in Randall, and that really was the main motivating factor behind its decision to strike down those limits in Randall. And so, I mean, the court really needs to take Randall seriously here, which means looking at the actual record. Yeah, yeah. But that means, I mean, taking Randall seriously means looking at the actual record. That's what Randall says to do. If we have danger signs, we need to really get into that record like the Supreme Court did in Randall. And we need to take into account all of the considerations that the Randall court found important, not just the ones, not just one of them, like inflation, for example. So inflation needs to be taken in context together with all of those other considerations. The Randall court said multiple times, these considerations taken together, taken together with these other considerations is not one of them. It's all of them together. And they're all looking at that core issue of whether the limits are inhibiting campaigning and thereby harming the democratic process. And if I can just very briefly touch on the group limits, there's nothing in the Supreme Court's order that would cast any doubt on this court's original analysis upholding the group limits under California Medical Association. So the court should do the same that it did the first time. Supreme Court said nothing to criticize that analysis. The plaintiffs made the same arguments they're making now to the Supreme Court, and the Supreme Court said nothing about them. And the challenge to the group limits was an afterthought in the plaintiff's case until they petitioned for certiorari. So they suddenly had more to say about them at that point. But before that, they made no particular focus on that. And the Supreme Court's, this court's original analysis under California Medical Association should stand. And so the court should apply Randall to the actual record in this case and uphold both the individual to candidate and individual to group contribution limits. Thank you, counsel. We'll hear a rebuttal. Ms. Murphy? Thank you. Just a few points here, honors. First, the state said repeatedly that the driving factor in Randall was that the limits didn't apply to the political parties, too. If that was the driving factor in Randall, the Supreme Court would not have remanded this case for this court to revisit the limits because the state made that argument to the Supreme Court in its brief in opposition. And Justice Ginsburg pointed that factor out in her concurring opinion. Yet the Supreme Court didn't say that's good enough, we're going to uphold these limits and deny cert here. It sent this case back down for this court to revisit. So whatever weight that factor has in the analysis, it cannot be the dispositive important factor that the state seems to think it is. You would agree, though, that in this case, Alaska's limits are different from Vermont's. Sure, they're different from Vermont's. That factor falls to the state. The inflation factor falls to you. The volunteer factor falls to the state because you disagree with that? I do disagree with that. The volunteer factor was focused not on volunteer services, as the state says. It was focused on volunteer expenses because Vermont did exempt volunteer services. And I don't see anything in Alaska law that exempts volunteer costs. So I think at best, that's a wash because it's just not clear to me on the face of it where that one cuts. I understand your argument. So let's get to factor five. The difference, there was no indication of quid pro quo transactions in Vermont. But in Alaska, the situation is far different. I was on the criminal appeal. The Speaker of the House, Codd, and Representative Coring. And I saw the videotapes where they go into the room and they say, I've got a lot of debt here. How can you help me out? And they get a campaign contribution. So tell me why that evidence isn't important in analyzing whether or not Alaska has a special reason. Because otherwise you're just saying, well, absent that kind of, you know, then factor five means nothing. Sure. The reason I don't think that evidence is sufficient is because when the Supreme Court said Vermont didn't have special justifications, the baseline the court used was the justifications in Buckley. It said that Vermont's problem was that the basic justifications Vermont had advanced were those present in Buckley. And whatever you think about the record of corruption in Vermont in Randall, I don't think there can be any serious dispute that there was a considerable record of quid pro quo corruption in Buckley. And I don't think that the record of quid pro quo corruption in Alaska is at all meaningfully different from what the Supreme Court considered in Buckley. So when the Supreme Court says that what you need is something different from what it had in Buckley, I think that means it's not enough to come in and say, look, we have some quid pro quo corruption, too. What in your view would constitute a special consideration? Because I think applying your argument and taking it to extreme, there's nothing. Sure. So I think there's a couple of things. One is, you know, if you're looking at corruption, I think you'd want to see a considerable record of persistent corruption related to campaign contributions. And one thing that's two things notable about the VICO scandal. First, it's 15 years ago. The state itself says it's in its past. It's not, you know, a still present pervasive thing that Alaska somehow has, you know, an unavoidable corruption. Many of the limits put in place and other restrictions addressed that. But the other thing is a lot of what was going on in the VICO scandal. I mean, what your honor just referred to didn't have to do with campaign contributions. It wasn't the regulated, transparent, disclosed campaign contributions. There was a little bit of that, but the vast majority of it was just out and out, you know, envelopes of cash, fictitious invoices. It was constant efforts to evade contribution limits because contribution limits are disclosed. They're transparent. They're not the means you go through if you're trying to engage in corrupt activities, the kind of quid pro quo corruption that counts under McCutcheon and Citizens United. The last thing I would just note is, you know, we are not afraid for the court to look at the record. We think the court should be looking at the record. The notion that we don't have evidence to support our position here is just completely inconsistent with the record. We have an expert witness, Mr. Polley, who testified from pages 80 to 120 and submitted an exhibit, an analysis in which he showed that contribution, that the costs of campaigning in Alaska are high and have increased significantly over the past 20 years. And we put on an expert, a former legislator, Mr. Coggill, who specifically testified, Judge Callahan, to exactly what you just said, that the costs were particularly high because of the vast size and rural nature of Alaska. And that he had to spend all this money driving around and flying around just even to see his constituents. So it's not our burden. It's the state's burden. But we did put on considerable evidence that we would welcome the court looking at. In fact, you know, as my slip of the tongue indicated, I think some of the state's experts actually help our case, not theirs. So we welcome the court looking at the record. That's exactly what we understand the Supreme Court have instructed the court to do. Exactly what the Supreme Court itself did in Randall in reversing a trial court that had made findings on a 10-page factual, a 10-day factual trial that were very, very similar to the factual findings in this case. So we encourage you to look at the record. And I think when you do, you'll find that Alaska just has not come up with anything that would allow Alaska to have the kind of limits that the court has already held are unconstitutional in the other states. Thank you, Counsel. The case just argued will be submitted for decision. Thank you both for your arguments this morning. And for I know it's sometimes awkward to appear by video, but we thank you for that. And we will be in recess for the morning. Thank you both. Great arguments on both sides. Thank you. This court, this session stands adjourned. Thank you.
judges: Thomas, Callahan, Bea